UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 20-80336-CIV-Cannon/Reinhart

DR. SHERNETTE ALEXANDER,

                Plaintiff,

vs.

SCHOOL BOARD OF PALM BEACH COUNTY, FL,

                Defendant.
_____/

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR ATTORNEYS' FEES AND NON-TAXABLE COSTS (ECF NO. 103)

Currently before me is Defendant's Motion for Attorneys' Fees and Non-Taxable Costs. ECF No. 103. This motion was referred to me by the Honorable Aileen M. Cannon. ECF No. 107. I have reviewed the motion, Plaintiff's response (ECF No. 110), and Defendant's reply (ECF No. 111). For the reasons stated below, I **RECOMMEND** that Defendant's motion be **DENIED.**

### BACKGROUND

Plaintiff Dr. Shernette Alexander brought this Title VII action alleging three counts of racial discrimination and retaliation against the Defendant Palm Beach County School Board. Shortly after Plaintiff filed her Third Amended Complaint (ECF No. 54), Judge Cannon granted the School Board's motion to dismiss Dr. Alexander's claim for racial discrimination for failure to identify comparators who were similarly situated. ECF No. 69. Following discovery, Judge Cannon granted the School Board's motion for summary judgment and dismissed the remaining claims, rejecting Dr. Alexander's allegations that her involuntary reassignment from Assistant

Principal (AP) to a less prestigious position and the delay in reinstating her to an AP position were in retaliation for her complaints of racial discrimination. ECF No. 100. Judge Cannon found that Dr. Alexander failed to establish the requisite causal connection because the individuals who were responsible for her reassignment and reinstatement were unaware of her discrimination complaints.

Final judgment was entered in the School Board's favor (ECF No. 101) and thereafter it filed the instant motion seeking recovery of its attorneys' fees and non-taxable costs. The School Board contends that it is entitled to fee-shifting under Title VII because Dr. Alexander's claims were frivolous. The School Board seeks $109,306.01 in attorneys' fees and non-taxable expenses. ECF No. 103.

## DISCUSSION

Generally speaking, in American litigation each party in a lawsuit bears its own attorney's fees. *See Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 602 (2001) (citing *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247 (1975)). However, there are statutory exceptions, such as those contained in Title VII of the Civil Rights Act of 1964, which authorizes the award of attorney's fees in certain circumstances.

The statute provides that "[i]n any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee (including expert fees) as part of the costs." 42 U.S.C. § 2000e–5(k). The Supreme Court has held that "[w]hen a defendant is the prevailing party on a civil rights claim . . . district courts may award attorney's fees if the plaintiff's claim was frivolous, unreasonable, or groundless, or if the plaintiff continued to litigate after it clearly became so." *CRST Van Expedited, Inc. v. E.E.O.C.*, 136 S.

Ct. 1642, 1646 (2016) (internal quotations omitted). Nevertheless, "[c]are must be taken to remain sensitive to the policy considerations militating against imposing fees on unsuccessful plaintiffs in discrimination claims which might 'discourage all but the most airtight claims' and 'undercut the efforts of Congress to promote the vigorous enforcement provisions of Title VII.'" *See Evans v. St. Lucie Cty. Sch. Dist.*, No. 2:17-CV-14450, 2019 WL 3997126, at *4 (S.D. Fla. Aug. 23, 2019) (J. Rosenberg) (quoting *Bonner v. Mobile Energy Servs. Co.*, 246 F.3d 1303, 1305 (11th Cir. 2001)).

> In determining whether a claim is frivolous, a court must analyze whether the case is so lacking in arguable merit so to be groundless or without foundation, rather than on the question of whether the case was successful on its merits. *Sullivan v. Sch. Bd. of Pinellas Cty.,* 773 F.2d 1182, 1189 (11th Cir. 1985)). In cases where the plaintiff adduces evidence sufficient to support their claims, findings of frivolity typically do not stand. *Id.*; *see also Hurtado v. Raly Dev., Inc.*, No. 11-24476-CIV, 2012 WL 3687488, at *6 (S.D. Fla. Aug. 27, 2012) (quoting *Dulaney v. Miami–Dade Cnty.*, No. 09–23259–CIV, 2011 WL 6754074, at *2 (S.D. Fla. Dec.22, 2011)). Factors also considered important in determining whether a claim is frivolous include: (1) whether the plaintiff established a prima facie case; (2) whether the defendant offered to settle; and (3) whether the trial court dismissed the case prior to trial or held a full-blown trial on the merits. *Sullivan*, 773 F.2d at 1189; *see also Cordoba v. Dillard's, Inc*., 41 F.3d 1169, 1179 (11th Cir. 2005). No one factor is dispositive, and the Court must consider the case as a whole and determine whether the claim was entirely without foundation. *Id.* In determining whether a claim was frivolous, courts view the evidence in the light most favorable to the non-prevailing plaintiff. *Id.*

*Guevara v. Fla. E. Coast Ry., LLC*., No. 18-CV-24726, 2020 WL 5578960, at *3 (S.D. Fla. Aug. 7, 2020) (J. Louis), report and recommendation adopted, 2020 WL 5572100 (S.D. Fla. Sept. 17, 2020) (J. Smith). "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)

Here, the first *Sullivan* factor weighs in the School Board's favor. Judge Cannon dismissed Dr. Alexander's racial discrimination claim for failure to establish a prima facie case because Dr. Alexander did not identify comparators that were similarly situated. ECF No 69. Later in the case, Judge Cannon dismissed Dr. Alexander's retaliation claims for failure to establish a prima facie case because she could not establish a causal link between her protected activity (complaining of racial discrimination) and the adverse employment action she suffered, given the evidence that the decisionmakers were unaware of her complaints. In assessing the frivolity of Dr. Alexander's claims, her inability to establish a prima facie case for any of the three counts alleged in the Third Amended Complaint weighs against her.

The second *Sullivan* factor is neutral because the School Board did not make a formal offer of settlement (ECF No. 103 at 3). *See Guevara*, 2020 WL 5578960, at *4. The third *Sullivan* factor weighs against Dr. Alexander because her claims were dismissed prior to trial. *See Evans*, 2019 WL 3997126, at *2 (citing S*ullivan*, 773 F.2d at 1189).

Even though two of the three *Sullivan* factors weigh against Dr. Alexander, I find that viewing the evidence in the light most favorable to her and considering the case as a whole, I cannot conclude that her claims were entirely without foundation. On the contrary, Dr. Alexander presented an abundance of evidence in support of her claims.[1]

---

[1] *See, e.g., Guevara,* 2020 WL 5578960 at *5 (court declined to impose fee-shifting because the plaintiff "advanced some evidence in support of his [Title VII] claims and had a good faith basis for bringing the claims [which] mitigates against a finding of frivolity." The plaintiff identified three comparators, although they were ultimately rejected by the court, and presented evidence that different versions of a qualifying exam were administered to different employees and that an argument with his supervisor undermined his chances of passing the test because the contents of the exam were at his supervisor's discretion. The plaintiff also proffered performance evaluations, which he claimed proved his supervisor's motivation for sabotaging his evaluations and exams.).

Specifically, Dr. Alexander's allegations of racial discrimination and retaliation, which she initially reported to the Office of Professional Standards naming fifteen co-workers who were engaged "in an orchestrated attempt . . . to slander, defame [her] professional reputation, and discriminate against [her]" (ECF No. 100 at 2), were corroborated by a teacher who worked with Dr. Alexander before her involuntary reassignment. That teacher, Michelle Francis, made sworn statements based on firsthand personal knowledge supporting Dr. Alexander's claims that she "was the target of a series of hate-filled and unjustifiable actions against her by a group of White teachers." ECF No. 75-1. According to Ms. Francis,

    a. Teachers went out of their way to refer to Plaintiff by her first name, refusing to acknowledge that she had obtained her Doctorate's degree and requested that she be referred to as Dr. Alexander, out of pure spite.

    b. The teachers took offense at the notion that she would even ask them to refer to her as Dr. Alexander.

    c. Plaintiff was mocked and became the subject of complaints filed by these teachers with the Teacher's Union about the manner in which she made hand gestures when she spoke.

    d. Plaintiff was the subject of a gripe session by these White teachers filled with constant unreasonable and unwarranted complaints against her.

    e. The teachers were brainstorming different allegations they could come up with so they could file a complaint against Dr. Alexander.

    f. The teachers filed an unwarranted complaint against Dr. Alexander for being a Jehovah's Witness and alleged that she was practicing her religion on school property when she was not.

*See* Francis Affidavit (ECF No. 75-1).  Ms. Francis, who was a Black teacher, believed that Dr. Alexander's race "played a pivotal role in why she was targeted and mistreated by these White teachers" and that they were determined "to find anything to build a case against Dr. Alexander." *Id.* at ¶¶ 16, 22.  Ms. Francis averred that "[t]he hatred against Dr. Alexander . . . was so bad that for a long time, [Ms. Francis] was afraid to be seen talking to her at school for fear that some of the vitriol would be spewed at [her]."  *Id.* at ¶ 15.

Ms. Francis, an Autism Spectrum teacher, believes that she was then retaliated against for reporting the conduct of the White teachers.  *Id.* at ¶ 28.  Shortly after reporting them, Ms. Francis received a letter of non-reappointment, even though she had no disciplinary history, had been rated as "highly effective" in her performance evaluations, and was commended for being "innovative;" perhaps most significantly, Ms. Francis was denied reappointment without explanation, even though there was a "critical shortage" of certified autism teachers in the district.  *Id.* at ¶¶ 26-27.  Also telling, only a week earlier Ms. Francis had been invited by Superintendent Galatowitsch to participate in the search for a new school principal.  *Id.*

Ms. Francis averred that after her non-reappointment, her position remained open for a significant period and was ultimately filled by a White teacher who was not certified to teach on the Autism Spectrum.  *Id.* at ¶ 29.  After receiving her notice of non-reappointment, Ms. Francis went to the teachers' union to speak to her Labor Relations Consultant (LRC).  While Ms. Francis was there, the LRC took a phone call and after hanging up, he exclaimed to Ms. Francis, "we got her . . . Alexander.  She's out of here!!"  *Id.* at ¶¶ 31-33.  At that moment, Ms. Francis realized the full scope of the "plot[] . . . to get rid of Dr. Alexander."  *Id.* at ¶¶ 34-35.

In addition to Dr. Alexander's claims, and the corroborative sworn statement of Ms. Francis, there is also the testimony by Superintendent Galatowitsch.  He interviewed each of the

teachers who had complained about Dr. Alexander's "lack of professionalism" and found their statements to be "questionable." ECF No. 100 (citing ECF No. 75-2). According to Superintendent Galatowitsch, he "never observed any behavior from Dr. Alexander that led [him] to believe that she engaged in any of the complained of actions." *Id.* In fact, Superintendent Galatowitsch believed that "Dr. Alexander was a victim of a culture that fails to equally value people from diverse backgrounds." *Id.* In other words, a high-level decisionmaker at the School District has acknowledged in a sworn statement that Dr. Alexander was the victim of racism in her workplace.

In sum, the facts adduced in this case, and sworn to by numerous witnesses, when viewed in the light most favorable to Dr. Alexander, demonstrate an appalling state of racial animus within the Palm Beach County School District. While that evidence ultimately did not rise to the level required to prove a Title VII violation, the School Board has not met the "stringent standard" of showing that Dr. Alexander lacked good faith in bringing her claims or that those claims were "frivolous, unreasonable, or without foundation." *Hughes v. Rowe*, 449 U.S. 5, 101 S. Ct. 173, 66 L.Ed.2d 163 (1980).

## RECOMMENDATION

Accordingly, it is hereby **RECOMMENDED** that the District Court **DENY** Defendant's Motion for Attorneys' Fees and Non-taxable Costs (DE 103).

## NOTICE OF RIGHT TO OBJECT

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Aileen M. Cannon, United States District Court Judge for the Southern District of Florida, within **FOURTEEN (14) DAYS** of being served with a copy of this Report

and Recommendation. Failure to timely file objections shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016).

**DONE AND SUBMITTED** in Chambers this 13th day of December, 2021 at West Palm Beach in the Southern District of Florida.

_____
BRUCE REINHART
United States Magistrate Judge